The lower court has stated and determined this case in the following written opinion:
"In this case suit for damages suffered by a minor child, a little girl, as the result of said child being struck by an automobile operated by Smith Stevenson.
"The child in question was six years old at the time of the accident and was not placed on the stand by plaintiff nor called for cross-examination by the defendant. The child was carried home in a car operated by a cousin of the defendant and the other occupants of the car were the little brother of the girl and the grown sister of the lady who operated the car.
"They carried the little girl to a point on the highway right outside of the Town of Bastrop, opposite and across from the point where she lived and stopped the car, intending for the children to get out and go home. The defendant, Smith Stevenson, driving in the car, was returning toward Bastrop after having carried Mr. Fred Carpenter to his home a short distance beyond the scene of the accident. A few feet to the rear of the car in which the plaintiff had been a guest and on the right hand side of the road traveling toward Bastrop, was a very bad mud hole which made that side of the road completely impassable to automobiles, necessitating that traffic pull to the left and use the left side of the highway only at that point.
"When Mr. Stevenson approached the parked car in which plaintiff was the guest, he was operating his car at an estimated speed of 20 to 30 miles. All of the witnesses agree that as he reached the parked car he recognized his cousin and spoke to her. He proceeded toward Bastrop and toward the left hand side of the highway, in order to pass the mud hole which was to the rear of the parked automobile. Mr. Stevenson testifies that when he was at a point approximately in the neighborhood of the rear of the parked automobile, for the first time he saw the little girl over the left fender of his car. At that time he could only see her head; that he immediately applied his brakes, brought the car to a standstill after it had traveled approximately the length of the car. The little girl was struck by the car and suffered grave injuries to her legs. Fortunately, medical skill restored most of the use of this limb, but the doctors feel a strong probability that the growth of the limb will be affected and in later years the use of the limb will be hampered. A large portion of the flesh above the knee along the thigh of the leg was ground away and while the use of the *Page 571 
limb at present is possible, the injuries and scars present a pitiful sight.
"There were a number of witnesses called in this case who testified as to what happened just previous to the accident and just after the accident, but as stated above, the little girl was not called and Mr. Stevenson was the only witness in the whole case who testified as to what actually happened right at the time of the accident. The two ladies in the car with whom the child was riding, testified that they did not know the little girl was outside the car or was attempting to cross the road. The point at which the accident happened was immediately to the rear of the parked automobile. Mr. Stevenson, in operating his car, as he stated himself, was pursuing a course which took him to the left side of the highway in order to avoid the mudhole on the right side and he saw the car parked on the left side of the highway between him and the mudhole.
"It is the duty of the operator of an automobile, when leaving the regular lanes of traffic on the highway in operating his car, to proceed with great caution. The Court is impressed with one fact in interpreting the evidence in this case, — that Mr. Stevenson saw the child immediately before the child was struck by the automobile, but he did not see the child while it was proceeding from the left side of the parked automobile to the rear of the automobile and to the place of the accident, some four or five feet to the rear of the parked automobile and some five or six feet from the left side of the highway. Mr. Stevenson does not contend or testify that this child ran from behind the parked automobile out in front of his car or that she ran from the left side of the road out in front of his car as he turned in behind the parked automobile. In other words, according to his testimony, the first he saw of the child was when she was in front of his car. The interpretation of this testimony can lead to but one conclusion and that is that Mr. Stevenson was not keeping a continuous lookout in front of his car as he was passing the parked automobile for if he had been watching the highway in front of his car he would have been in a position to testify how the little girl arrived at the scene of the accident, that is, whether she had been standing in the highway waiting to cross or had suddenly run out to this point.
"The Court feels that the evidence clearly shows that Mr. Stevenson evidently turned his eyes from the road to the parked automobile where his cousin was sitting as he passed and spoke to her. As stated above, the law imposes a high duty and caution on anyone operating an automobile which leaves the regular lanes of traffic and uses the left or wrong side of the highway. Had Mr. Stevenson been watching and seen this child when she reached the point on the highway in front of his car, the Court feels that this accident could have easily been avoided because the evidence shows that even though he did not see the child until she was immediately in front of his fender, he was able to stop the car before anything except the front wheels, bumper or fender had struck the child and that had he been watching and seen this child when she came onto the left side of the highway, he had plenty of opportunity to avoid the accident by cutting to the right even though it would have put him in the mudhole, as this accident happened on the left hand side of the highway a short distance from the curb or ditch and there was nothing on the remaining portion of the left side and the entire right side of the highway except the mudhole and had he been watching and seen the child, he could have easily avoided the accident by driving his car in the mudhole or cutting to the right. As stated above, this is not a case where it is contended that the child suddenly ran out in front of defendant; no explanation whatsoever is offered as to how this child reached the scene of the accident or the point where the accident occurred. The Court, therefore, after careful consideration of the testimony, is of the opinion that the accident was caused by the negligence of Mr. Stevenson in not keeping a proper lookout, as he was passing the parked car, using the left side of the highway, operating his car out of the regular lane of traffic.
"The Court feels that there should be judgment for the benefit of the minor in the sum of $7500.00.
"Let there be judgment for actual damages for the father for the hospital, nurses, medicine, —
Hospital Bill $422.50 Special Nurses' Bill 347.50 Special Nurses' Bill 191.50 Medical Bill 130.92 *Page 572 
"The Court thinks that $1000.00 would be a reasonable amount to allow for medical expenses in this case, that is, for doctors' expenses, which would make a total altogether of actual damages of $2092.42."
Defendants are prosecuting this appeal and plaintiffs have answered the appeal praying for an increase in the amount of the award made by the lower court.
Mr. Fred Carpenter is the Sheriff of Morehouse Parish, Louisiana, and is one of the defendants herein. Mr. Smith Stevenson is his cousin and also his Chief Criminal Deputy. Mrs. Sue Jones and Miss Louise Carpenter, now Mrs. Louise Amman, are daughters of Mr. Carpenter, furthermore, they are also cousins of Mr. Stevenson. Mrs. Sue Jones and Mrs. Louise Amman are both teachers in the public schools of Bastrop, Louisiana.
Little Joan Keller, who was injured in the accident, was six years and ten months of age at the time and was attending the public school in Bastrop. Mrs. Jones and Mrs. Amman lived at the time with their father or near to him on the Bonner-Ferry Road, a short distance outside the corporate limits of the Town of Bastrop. The little Keller girl lived with her parents on the same road approximately two or three hundred yards nearer the Town of Bastrop.
When school recessed for the noon hour on February 26, 1940, Mrs. Jones and Mrs. Amman got into their car, a Tudor Chevrolet sedan, preparatory to going home for lunch. As was their custom, they placed Joan Keller and her 8-year-old brother on the back seat, intending to drop them at their home for lunch. They proceeded out the Bonner-Ferry Road until they arrived at the Keller home. The automobile was stopped on their right side of the road and the door opened for the children to alight. The Keller home was on their left side of the road which necessitated the children crossing the road. Mr. Stevenson had been ahead of them, traveling in the same direction and conveying Mr. Fred Carpenter to his home for lunch. Mr. Stevenson had done this many times before.
Mrs. Jones saw Stevenson when he turned his car at the Carpenter home and started on his way back toward Bastrop. Very soon after the car occupied by the ladies had been stopped and the door opened for the children to descend, Stevenson approached in his car. He recognized his cousins and they exchanged greetings by speaking or waving the hands. Stevenson did not stop but continued at a speed of from fifteen to twenty miles per hour. He was about the middle of the road when he reached the car occupied by the ladies and approximately four or five feet to the left of their car. Some fifty feet to the rear of the car occupied by the ladies, there were ruts in the road leading to a mudhole which extended entirely across the road and the ruts used in crossing this mudhole were on the extreme left hand side of the road when traveling toward Bastrop. That made them directly behind the ladies' car. As the front of Stevenson's car passed the rear of the parked car he veered his car to the left, preparatory to cutting into these ruts, and his automobile struck the child when she was to the rear of the automobile from which she had alighted and on the left hand side of the road from the direction Stevenson was traveling. She was directly behind the car and not more than four or five feet to its rear.
Stevenson was the only eyewitness to the accident and he testified in part as follows:
"Q. Did you see the door open on the the right hand side of Mrs. Jones' car? A. I did not.
"Q. Now, Mr. Stevenson, you state that the first time that you saw the little girl was when her head was over your left fender? A. That is correct.
"Q. I ask you, had you struck her at that time? A. I had not. I guess not. I am sure I hadn't though, because she was standing up.
"Q. She was standing still at the time? A. Her head was up over the fender probably 18 inches from the bumper. I judge she was about 18 inches from the bumper. She had stopped and it looked like she was trying to whirl around and go back. Of course, I couldn't see any motion of her body down below the fender at all but that I judged she was trying to do.
"Q. When you saw her head for the first time, how far was she at that time to the rear of Mrs. Jones' car? A. I would say she was some six or seven, or five or six feet, toward the middle of the road and probably three or four feet, maybe five, behind the car, back behind it.
"Q. In order to place your automobile in a position to cross in the formed ruts on the north side of the highway, was it necessary for you to cut your automobile to the *Page 573 
left over the center line, to the rear of Mrs. Jones' car? A. It was. As I recall, her car was right in line with the line of the ruts that came through the mudhole. You see there were two mudholes, one in front of her car down there and one behind her car, and as I came across there, there was one line of ruts across both places. They were also over on the north side of the road or the east side. I came across there and come across the road and came out about the middle of the road and, naturally, was coming around her car to make it to the ruts that went through the other mudhole. * * *
"Q. Now at the time you spoke to Mrs. Jones, about where was your car and her relative location? A. I imagine the front end of my car was about even with the front end of her's.
"Q. And what was the next thing you saw? A. Well, I don't recall just what happened between that and the time I saw the little girl's head. I imagine, like any other driver, I didn't know there were any children there and I never thought of any children being there, or I did, I imagine, look up the road to see if any other car was coming and when I looked down I saw the little girl's head.
"Q. You were veering to your left side of the road at the time? A. Yes, sir.
"Q. And at the time you struck the child you were veering to the left? A. Yes, sir; going at a kind of angle across the road to get back into those ruts.
"Q. Mr. Stevenson, when you struck the child was she on your left hand side of the road? A. Me coming to town, yes she was over on, I would say, about middle ways of the center of the road and the shoulder of the road over on the left hand side."
The little girl was undoubtedly struck and knocked down by the Stevenson car's left front fender and run over and struck by the left front wheel. The testimony given by Stevenson clearly convicts him of negligence in veering to the left so closely behind the parked car and to his extreme left side of the road at a time when he could not see if anyone was behind the automobile. Even though his speed was only fifteen miles per hour, it was too fast under the circumstances. Furthermore his testimony clearly discloses that he was not keeping the close lookout required of him under the prevailing conditions and no contributing negligence has been shown on the part of the child, even though she could be held at her tender age to be guilty of contributory negligence, which we seriously doubt.
We could end the discussion of the case here and find that Stevenson's negligence was the sole, proximate cause of the accident and resultant injuries to Joan Keller but we wish to discuss some phases of the case a little further.
Defendants offered as witnesses Mrs. Jones and Mrs. Amman, the ladies in the parked car. Not only are defendants bound by their testimony but there is no dispute or question as to the truthfulness of it. They testified that they had stopped, opened the door on their right hand side before Stevenson passed them and that Joan Keller had alighted, her brother following her out, and was standing on the ground by the door when Stevenson passed and spoke. Stevenson testified that he did not see that the door was opened and did not see the children. If he had used the prudence and caution required of him at the time, he would have seen them both. It is possible, as urged by counsel for defendants, that the door, opening toward the front of the car, may have hidden the children from Stevenson's view but it could not have hidden the open door from his view. Instead it should have attracted his attention.
Stevenson was closely related by blood and business ties with the Carpenter family. He knew that Mr. Keller lived where the automobile was parked and that Mr. and Mrs. Keller had some children. He knew where Mrs. Jones and Mrs. Amman lived and that it was not at the Keller home. He knew they were school teachers and that it was noontime and they were on their way to lunch. He should have known they were not living at the Keller home as neither had made a move to get out of the car. The only reasonable conclusion Stevenson could have reached was that they had stopped and opened the door for someone else to get out and he should have been certain that someone was not behind the parked car before he veered farther to the left and behind the parked car only a few feet to its rear.
We are sure that Stevenson's negligence was the sole, proximate cause of the accident and that he and his liability insurer are responsible in damages for the *Page 574 
injuries caused to Joan Keller and her parents.
The lower court allowed damages to Douglas Keller, father of Joan Keller, in the sum of $2,092.42, which included hospital bill, special nurses' bills, medical bill and $1,000 for doctors' bills. Plaintiffs contend here that the amount of the doctors' bill is $1,500 and that the judgment in favor of Douglas Keller should be increased by $500.
Joan Keller was rushed to the sanitarium in Bastrop (known as the Garnier Clinic). She was given a general anesthetic and her wounds cleaned and dressed. Later she was given another general anesthetic and a skin grafting operation performed in an attempt to hide as much of the ugly scar on her leg as possible. She remained in the sanitarium 72 days and under the care of special nurses and for the first two weeks the doctors, three in all, devoted their time to save her life and from then on in treating the wounds. After Joan left the sanitarium she was confined to her bed at home for thirty days and had to get about with the use of crutches until January 15, 1941, when she discarded them, but she was in constant touch with the doctors during the greater part of this time. Joan Keller's injuries were serious.
Dr. Rawls, a member of the Garnier Clinic, describes Joan's injuries as follows:
"A. On February 26th, around the middle of the day they brought Joan Keller into the Clinic suffering at the time with extreme state of shock and loss of blood. She had received in some kind of accident a severe injury to her left thigh and knee, which was a severe, contused laceration of the extensor muscles and the tendons of the extensor muscles, the lateral ligaments of the left knee and the opposite semilunar cartilage of the left knee. This wound was filled with sand, gravel and dirt which had apparently been ground into it. The tear was completely into the knee joint, showing the smooth edge of the bones of the thigh and the bones of the leg. She also had numerous general body contusions over her body, face and legs. This wound was cleansed as well as possible and treated with antiseptic solution; the pieces of gravel and dirt washed out and picked out as well as possible. The dead tissue that was considered not livable was trimmed away and the fragments of the muscles and tendons sutured back into place and the wound was closed with drain and she was admitted to the Clinic.
"Q. Now, at the time she was admitted and first treated by you, she was in a very critical condition, was she not? A. We considered her so.
"Q. Now, Doctor, just state what treatment you administered to her not only at that immediate time but thereafter while she was in the hospital and her general condition? A. Now, we considered the girl's condition serious for approximately two weeks. During that length of time, I would say, of course, we were working on the immediate wound, but during that period of time, I would say we were working primarily to save the child's life. Of course, we gave her the precautionary treatment for tetanus and gas baccilli gangrene, the antitoxin for it, with the use of sedatives and glucose, and of course the nursing care. Of course, the repair in the original first-aid treatment required a general anesthetic, ether.
"Q. That was done on the first day? A. The very first day, immediately after the injury.
"Q. Now, for the next few weeks after the injury, what was her general condition? A. Well, we figured that after approximately two weeks that the child was out of immediate danger of death. We were then, of course, from then on working to preserve the leg as much as possible. On April 12th, we performed a skin graft on the leg which we considered successful and she remained in the hospital until May 8, 1940.
"Q. From February 26th until May 8th, she was in the hospital? A. Yes, sir.
"Q. Could you say during what part of that time she was under the care of special nurses, approximately? A. Well, approximately for 30 days she was under the care of both a night and day nurse and for about two weeks after that she was under the care of one nurse. I don't remember exactly, but it seems to me that for several days one nurse was on 24-hour duty and then she stepped down to half time for about two weeks after that.
"Q. That is just merely an estimate? A. Yes, sir; it is just merely an estimate on my part, I don't know about that.
"Q. Now, after she was discharged from the hospital on May 8th, did you continue to treat her at her home? A. Well, I saw her at her home some in the next 30 days *Page 575 
but mostly her mother brought her back to the Clinic just for dressing, but while she wasn't there, we had advised about 30 days in bed at home, but she brought her back to the Clinic for dressing for the next 30 days, and from that time on she was up on crutches continuing on crutches until the 15th of January, and following that for several months, we saw her every two or three days, and we saw her regularly until January 15, when we took her off crutches.
"Q. In other words, from the time of the accident until January 15, she was under your supervision and care? A. Yes, sir.
"Q. Either at the hospital or at home? A. Yes, sir."
Dr. Garnier described Joan's injuries as follows:
"A. She was given a general anesthetic and we cleaned up the wound and washed out as much dirt, mud and rocks as we could and brought over the remaining tissue that we had and tried to do reconstruction work or plastic of that area of the lower left thigh. You see the wound extended into the kneejoint itself and carried away the capsule of the joint and the ligaments of the joint both on the side and to the front, and there was a good deal of gravel and dirt within the kneejoint itself and we spent some time washing that out and removing it and cleaning up the wound."
Dr. Garnier further testified:
"Q. Have you seen her lately to examine her. A. Yes, but I don't remember just when off hand, whether it was a month or two months ago.
"Q. At the time you made your examination and based on that examination, what is your opinion as to her permanent condition? A. Well, I don't have to take the last examination to know what is the permanent condition because I know that most of the extensor muscles and tendons of the thigh are gone, as well as the lateral capsule of the kneejoint and also the ligaments of the kneejoint are gone and it can't be replaced.
"Q. Do you think that she will every recover the normal use of her leg? A. No; it will be impossible for her to do that.
"Q. Does she have any visible scar on the leg? A. She has a large scar there which is self evident; you can see on the child yourself; the joint is swollen — the knee protrudes out more.
"Q. Did she appear to experience any suffering while in the hospital? A. As I said, we despaired of her life for probably two weeks and she was in there up until in May before we could even think of letting her go home. * * *"
"Q. I notice on the leg here, in the pictures, the areas above the knee, those are the places where the skin was taken for the purpose of grafting? A. Yes, sir. We did a sliding graft in a way; we undermined some of this tissue from down below and kind of slided under, also cleaned, you see where this accident happened from below the knee there up two-thirds of the thigh, everything down to the bone, and in front even, was torn away, leaving nothing but dirt and gravel in there and the joint was wide open. You could see the knee cap. You could see the upper end of the lower leg or the bone, that is, the tibia, and you look into the joint itself, as well as the upper, you could see the bone, the femur or the thigh. She was very fortunate in that the big blood vessels were not injured because they come over and go in and turn around the femur or thigh bone inward. There was only just a small portion of the quadriceps tendon, that is, the big muscle that extends to the lower leg, left and we picked up with sutures some of the remaining tissue and smoothed it over to this tendon and sewed the tendon back as much as we could to the knee cap."
* * * * *
"Q. The pictures which have been taken were flash light pictures, Doctor, and they accentuate the shadow, does that not make the scar look darker or blacker? A. No, sir. I don't think the pictures bring out the scars clearly or as clearly as a colored photograph would do. Of course, this thing is contracted a little since the accident; this thing was lacerated from here to here and what we did was to undermine this flesh and pull it down. Maybe as she becomes a young lady, we can do a little bit more plastic surgery and help the scar more. The great danger is the epiphysis, the extent of the ossification of the lower end and the femur being injured. When they are injured, they will grow abnormally too long and sometimes they will stop alone and we have been watching this girl very closely to see if there is going to be any shortening or lengthening of this limb due to the injury to the center of ossification of the lower end of the femur. She walks *Page 576 
with a decided limp. I don't think she will ever get over that. She bends her knee a little bit, that is, it is a little knockkneed, that is due to scar tissue in a way and due to a loss of the ligaments and the capsule of the joint."
Dr. Ogden, another member of the Clinic, also attended Joan Keller during her illness and assisted in the operation.
Dr. Garnier testified that the charges for medical and operative work are $1,500. He stated that when there was an attempt made to compromise the case, he agreed to take $1,000. However, that was for a quick settlement under compromise. There is no testimony offered to show that the charges made for services by the Garnier Clinic are exorbitant or excessive and we know of no reason we can give for reducing the bill from $1,500 to $1,000. The prayer to increase the judgment in favor of Douglas Keller from $2,092.42 to $2,592.42 will be allowed.
The lower court allowed $7,500 for the benefit of Joan Keller and plaintiff prays that it be increased to $12,000. Defendants complain that the amount is excessive.
The scars on Joan's left leg are best proven by the pictures in the record which are shown not to exaggerate them. One scar begins on the outside of the knee about half way down the knee and extends upwards for five or six inches. It spreads across the front of the leg at the top of the knee, being some three or four inches in width. The thigh above is scarred in some six or seven places, due to the removal of skin for grafting. They are truly horrible scars and have marred severely the appearance of her leg.
That Joan will never have full use of her leg is admitted by all the doctors who testified in the case. They admit that at the time of trial she had a fifty per cent disability of the left leg and doctors who testified for the defendants believe that the injured leg will improve some and finally be reduced to a twenty-five per cent disability; and that she will always limp is not denied. The lower part of the thigh of the left leg is reduced in size by the injury and the knee is enlarged, causing the kneecap to protrude farther, marring the appearance of the leg. In walking she keeps the left leg behind her to some extent and the knee wobbles or moves inward towards the other knee when she places her weight on it.
Dr. Rawls, who treated Joan and looked more closely after her case than the other two doctors, does not think she will ever be able to run, play and skate as other children do. She may do these things to a limited extent and he does not think, when Joan grows older, that she will ever be able to stand on her feet for a long period of time, such as is required of saleswomen in stores, or that she will ever be able to stand on this leg a long enough time to do ordinary housework that is required around home. The other doctors think Joan will be able to play and skate but never entirely able to enter into competitive games or skate with other children.
Our conclusion is that Joan Keller is crippled and will carry through life the unsightly scars on her leg. Being a girl the injured leg and unsightly scars will cause her more damage than were she a boy. Her chances for a favorable marriage in the future are greatly lessened by the scars and injury to the leg. The pain and suffering experienced by this little girl was very great.
We have been unable to find a case closely similar in facts to this one where an award was made. It is difficult to find any two cases where all the elements of damage are similar and for that reason in arriving at an award each case must stand on its own peculiar facts or combination of facts. We are of the opinion the award in this case is inadequate by $2,500 and that the judgment in favor of the father and mother for the benefit of their minor daughter, Joan Keller, should be increased by $2,500.
It therefore follows that the judgment of the lower court is amended by increasing the award to Douglas Keller from $2,092.42 to $2,592.42 and by increasing the award in favor of Douglas Keller and Mrs. Annie Keller, for the use and benefit of Joan Keller, from $7,500 to ten thousand ($10,000) dollars and as amended, the judgment of the lower court be affirmed, with costs. Costs of appeal to be paid by appellant. *Page 674